UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

R M,

    Plaintiff,

v.

Case No. 12-15375

HONORABLE DENISE PAGE HOOD

SUN LIFE ASSURANCE COMPANY
OF CANADA,

    Defendant.
_____/

**OPINION AND ORDER ON CROSS-MOTIONS FOR JUDGMENT**

**I.    BACKGROUND/FACTS**

On December 7, 2012, Plaintiff RM filed a Complaint against Defendant Sun Life Assurance Company of Canada alleging: a claim under 29 U.S.C. § 1132(a)(1)(B) to recover full disability employee benefits (Count I) and Violation of Procedural Due Process under 29 U.S.C. § 1133; 2(a)(2) (Count II). This matter is before the Court on cross-motions for judgment on the administrative record filed by the parties. Responses and replies have been filed. A hearing was held on the matter.

RM is and was a participant in a welfare benefit plan under ERISA by virtue of her employment with Hurley Medical Center ("Hurley"). (Comp., ¶ 4) Sun Life is the claims administrator and insurer of the disability portion of the Plan. (Comp., ¶ 5) The subject long-term disability insurance was underwritten by Sun Life, Policy

No. 10119. (Comp., ¶ 7)

RM was employed by Hurley for more than seventeen years prior to the filing of her long-term disability claim. (Comp., ¶ 10) RM was an Interventional Radiology Technologist which requires providing medical treatment to patients, conducting examinations and occasional administrative duties. (Comp., ¶ 11) RM performed the following duties: schedule and prepare patients for procedures; provide and insure the ability, comfort, physical, psychological and educational needs of patient during and after the procedure; administer intravenous media and/or medications; operate computerized equipment for the medical procedures; maintain inventory of necessary drugs and supplies; and, exercise judgment and ability to understand, react effectively and treat needs of patient age groups served. (Comp., ¶ 12)

In 2011, RM began experiencing extreme and unusual anxiety and panic attacks, as well as uncontrollable crying spells while at work. (Comp., ¶ 13) RM's mental condition began to unravel and she descended into a state of deep psychological disability. (Comp., ¶ 14) She began having suicidal and homicidal thoughts, including to those who were attempting to treat her conditions. (Comp., ¶ 15) RM was involuntarily committed to Hurley's mental health unit and was deemed disabled by her physicians and unable to return to work for her safety and those of the

organization. (Comp., ¶¶ 16-17) As of May 13, 2011, RM was no longer able to perform the duties of her job. (Comp., ¶ 18)

RM applied for disability benefits, which were denied on January 3, 2012. (Comp., ¶ 20) On June 29, 2012, RM appealed the decision. (Comp., ¶ 21) Sun Life denied the administrative appeal by conceding that RM could not work while committed to a psychiatric facility, but claiming that she would be able to return to the work environment upon discharge. (Comp., ¶ 23) Although RM supplied Sun Life with overwhelming proof of loss that her condition was severely debilitating, Sun Life, for a fee, was able to secure a medical opinion by a file reviewer who rejected all this information as "non-objective." (Comp., ¶ 24) RM claims that Sun Life has created relationships with outside vendors who will provide opinions that the insureds are "not disabled." (Comp., ¶ 25) RM asserts that the monetary value of her claim played a significant role in the wrongful denial of benefits by Sun Life and its agents. (Comp., ¶ 32) The handling of her claim and the appeal process resulted in a clear abuse of discretion by Sun Life and that RM was denied a full and fair review of their claims by appropriate fiduciaries. (Comp., ¶ 33) RM's claim was ultimately denied on October 31, 2012. (Comp., ¶ 29)

Since the denial of benefits, RM's condition has worsened. She is involved in regular psychiatric sessions, psychotherapy, and continuous prescription treatment

which keeps her in a bedroom for entire days at a time. (Comp., ¶¶ 26-27) RM is unable to resume any form of full or part-time employment. (Comp., ¶ 28) RM claims disability beginning May 14, 2011 due to Major Depressive Disorder, Recurrent, Severe and Panic Disorder without Agoraphobia. (AR, Bates No. 869)

## II.  ANALYSIS

### A.  Standard of Review

Section 1132 is the civil enforcement provision of ERISA which states, "[a] civil action may be brought ... by a participant or beneficiary ... to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). A denial of benefits under an ERISA plan "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 103, 115 (1989). *De novo* review is limited to the record before the administrator. The court must determine whether the administrator "properly interpreted the plan and whether the insured was entitled to benefits under the plan." *Hoover v. Provident Life and Acc. Ins. Co.,* 290 F.3d 801, 809 (6th Cir. 2002).

In *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609 (6th Cir. 1998),

pursuant to a majority decision, the panel set forth "Suggested Guidelines" to adjudicate ERISA actions. The Sixth Circuit stated that the Rule 56 Summary Judgment procedure is "inapposite to the adjudication of an ERISA action" because of the Circuit's "precedents [which] preclude an ERISA action from being heard by the district court as a regular bench trial." *Wilkins*, 150 F.3d at 619. "[I]t makes little sense to deal with such an action by engaging a procedure designed solely to determine 'whether there is a genuine issue for trial.'" *Id.* The district court should not use neither the summary judgment nor the bench trial procedures in deciding ERISA actions. *Id.* at 620. As to the merits of the case, the district court should conduct a review based solely upon the administrative record and render findings of fact and conclusions of law. *Id.* at 619. If a procedural challenge is alleged, such as lack of due process afforded by the administrator or bias on its part, only then may the district court consider evidence outside to the administrative record. *Id.* The discovery phase in an ERISA action will only cover the exchange of administrative record, and, if there is a procedural due process claim against the administrator, discovery is limited to evidence related to procedural challenges. *Id.*

Both parties agree that the *de novo* standard of review applies in this case. The plan administrator's decisions are not entitled to deference. *Id.* at 616. The court gives a "fresh look" at the administrative record, giving proper weight to expert

opinions in accordance with supporting medical tests and underlying objective findings. *Hoover v. Provident Life & Acc. Ins. Co.*, 290 F.3d 801, 809 (6th Cir. 2002). To succeed on a disability claim benefits under ERISA, a plaintiff must prove by a preponderance of the evidence that he or she was "disabled," as that term is defined in the Plan. *Tracy v. Pharmacia & Upjohn Absence Payment Plan,* 195 Fed. Appx. 511, 516 (6th Cir. 2006). The court must first look to the nature of the plaintiff's job, then to the medical evidence, applying the evidence to the occupational standard. *Elliott v. Metropolitan Life Ins. Co.*, 473 F.3d 613, 618 (6th Cir. 2006).

### B. Policy Language

The Policy provides that an insured was Totally Disabled when Sun Life determines that "the Employee, because of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation." (Policy at 10) "Own Occupation" is defined under the Policy as:

> The usual and customary employment, business trade, profession or vocation that the Employee performed as is generally recognized in the national economy immediately prior to the first date of Total or Partial Disability began. Own Occupation is not limited to the job or position the Employee performed for the Employer or performed at any specific location.

(Policy at 10) Benefits are not payable under the Policy until after an insured remains

continuously Totally Disabled during the Elimination Period of 180 days. (Policy at 3, 10) A Proof of Claim must consist of: a description of the disability; the date the disability occurred; and the cause of the disability. (Policy at 30) A Proof of Claim requires evidence demonstrating the disability including, but not limited to, hospital records, Physician records, Psychiatric records, x-rays, narrative reports, or other diagnostic testing materials as appropriate for the disabling condition. (Policy at 30)

### C. Review of Administrator's Decision

#### 1. Parties Arguments

Sun Life argues that the record does not support RM's claim that psychological impairment prevented RM from performing the material and substantial duties of her "own occupation" as defined in the Policy after she was hospitalized on May 20, 2011. Sun Life claims that RM's treating physicians indicate that her symptoms resulted from specific workplace environment issues and her difficulties with her job and co-workers. Sun Life notes that RM's health providers state that she felt better when she stopped working and was able to engage in various social activities. Sun Life asserts that RM has not met the Policy language requirement that a claimant must not be able to perform her "own occupation" because the term is defined based on "generally recognized in the national economy" which expressly states that the term is "not limited to the job or position the Employee performed for the Employer or

performed at any specific location." (Policy at 10).

RM argues that the administrator's decision must be reversed because all of her medical providers found that RM could not perform her "own occupation" in "any" work environment (RM Motion, p. 21; RM Resp., p. 21) Specifically, RM refers to the affidavits submitted by her medical providers asserting she is unable to work in any position.

For the reasons set forth below, the Court's *de novo* review of the medical record before the administrator shows that the RM has satisfied the Policy requirements and has shown she is disabled under the Plan.

### 2. RM's Occupation and Nature of Job

In its Motion for Judgment on the Pleadings, Defendant does not define RM's occupation. As asserted in RM's Complaint, RM was an Interventional Radiology Technologist which required providing medical treatment to patients, conducting examinations and occasional administrative duties. (Comp., ¶ 11) RM performed the following duties: schedule and prepare patients for procedures; provide and insure the ability, comfort, physical, psychological and educational needs of patient during and after the procedure; administer intravenous media and/or medications; operate computerized equipment for the medical procedures; maintain inventory of necessary drugs and supplies; and, exercise judgment and ability to understand, react effectively

and treat needs of patient age groups served. (Comp., ¶ 12) Without any rebuttal from Defendant in its motion, the Court finds that this definition of RM's occupation governs this case.

### 3. Medical Evidence

The Administrative Record submitted by the parties contains records from RM's treating therapists and physicians, in addition to hospital records.

RM's primary care physician, Punam Sharman, MD, began treating RM for psychological disorders as early as January 2010. It was Dr. Sharman who urged RM to go to the Emergency Room immediately to be admitted to the pscyh floor on May 16, 2011. (AR 1064) Dr. Sharman noted RM's depression had worsened and that she was suicidal. (AR 1064) RM was discharged on May 20, 2011 from the hospital diagnosed with Somatization Disorder; Personality Disorder; Hypertension; Occupational Problem, with a Global Assessment of Functioning of 19. (AR 1041)

Three affidavits of RM's medical providers, almost verbatim, assert that based on RM's various mental health conditions she is unable to resume work at "any" occupation. (AR 1350, 1386, 1402) The first provider, Future Edelen, a licensed clinical social worker, has treated RM for various mental health conditions, including: Major Depressive Disorder, Recurrent, Severe Without Psychotic Features; Dsythmic Disorder; and Panic Disorder Without Agoraphobia. (AR 1386) Ms. Edelen

concluded that based on her mental assessment of RM, it would be difficult for RM "to function in any occupational setting, under any circumstances, on a regular basis, given her current mental health conditions." (AR 1387) Ms. Edelen's patient progress notes as to sessions with RM show that from October 2010 through November 2011 RM suffered from anxiety, was very distressed, was tearful and anxious, and was having dreams of being at work causing depression. (AR 1006-1026) Although, as noted by Defendant, RM at times was feeling relaxed because she was not at work, the overall tenor of RM's sessions with Ms. Edelen was that she was anxious and depressed. As of November 1, 2011, RM was feeling depressed and experiencing panic attacks. (AR 1019)

Sunita Tumala, M.D., Board Certified in neurology, specializing in neurology and clinical neurophysiology, stated that she has provided medical treatment to RM on a regular and continuous basis. She had observed and evaluated RM's mental health conditions, including severe psychological illness and cervical spinal radiculopathis. (AR 1402) Dr. Tumala indicated that given the individual and combined effects of RM's various medial conditions, RM is unable to "resume full or part-time work at any occupation on a continuous and sustained basis." Dr. Tumala has previously recommended RM be placed on occupational disability status. (AR 1402) Tumala found that RM's medical conditions have adversely affected her

cognitive abilities, her visual acuity, her physical coordination and diminished her energy levels. (AR 1402) Although Dr. Tumala believed in June 13, 2011 that RM need not be on disability for "neurological problems," she also concluded that RM "has significant psycho social stressors and has been diagnosed with bipolar disorder." (AR 1405) Dr. Tumala encouraged RM to continue psychiatric treatment for her psychological disorders because they contribute to RM's feelings of dizziness. (AR 1405)

William McAllister, M.D., a psychiatrist specializing in the treatment of mental illness and emotional disturbances, indicated he has provided medical treatment to RM on a regular and continuous basis using typical modalities. (AR 1350) Dr. McAllister has observed and evaluated RM's medical conditions which includes, among other diagnoses: "major depressive disorder, recurrent, severe without psychotic features; dysthymic disorder; panic disorder without agoraphobia, vertigo and high blood pressure." (AR 1350) Dr. McAllister has treated RM for both suicidal and homicidal ideation. (AR 1350) Dr. McAllister noted that attempts to treat RM have stabilized RM's medical condition, but have not resolved or improved RM's functional capacity from an occupation standpoint. (AR 1351) The Initial Intake Assessment of RM on October 19, 2010 indicated RM presented with "feeling depressed." (AR 1369) RM's GAF on October 19, 2010 was at 60. (AR 1375) Dr.

11

McAllister's psychiatric evaluation of RM on June 20, 2011 showed her prognosis was "guarded" with a GAF of 47. (AR 1364) Dr. McAllister's Psychiatric Progress Notes from June 2011 through March 2012 show that RM was overwhelmed, anxious, having bad dreams, and she also indicated she was not depressed. (AR 1356-1368) As of April 19, 2012, RM's mood was unstable, causing RM distress rendering her unable to manage daily activities. (AR 1366)

Defendant's review of RM's claim was initially performed by Bonnie Bray, a Sun Life employee and social worker. Ms. Bray's review consisted of summarizing the medical record submitted by RM. (AR 215-219) Defendant also used Behavioral Medical Interventions ("BMI") to review RM's medical records. (AR 1438-1447) The file reviewer, Adam Ameele, a Licensed Clinical Psychologist-Doctorate, had been in clinical practice for fourteen months when he reviewed the file. (AR 1448) Dr. Ameele did not personally examine RM.

Defendant argues that RM failed to produce sufficient and "objective" evidence that she is disabled and unable to return to work based on her condition. The Proof of Claim provision requires a description of the disability, the date the disability occurred, and the cause of the disability. (Policy at 30) The Proof of Claim requires evidence demonstrating the disability including, but not limited to, hospital records, Physician records, Psychiatric records, x-rays, narrative reports, or other diagnostic

12

testing materials as appropriate for the disabling condition. (Policy at 30) The Policy does not require "objective" proof other than the records noted. RM submitted the required hospital and physician records, including affidavits by her treating medical personnel that RM was disabled and the diagnosis of her condition. There is nothing on the record to rebut RM's diagnosis, other than Defendant's reviewers' conclusions. Defendant's reviewer, Dr. Ameele, agreed to nearly all of the diagnoses.

Courts have rejected a file reviewer's opinion relating to psychiatric diagnosis. Psychiatric opinions are inherently subjective. *See Westphal v. Eastman Kodak Co.,* 2006 WL 1720380, at *4-5 (W.D.N.Y. June 21, 2006)(a proper psychiatric diagnosis requires personal evaluation of the patient's credibility and affect). Compared to a doctor treating physical symptoms, a psychiatrist must treat a patient's subjective symptoms by interviewing the patient and spending time with the patient as to understand and treat the subjective symptoms described by the patent. *See, Smith v. Bayer Corp. Long Term Disability Plan,* 444 F.Supp.2d 856, 873 (E.D. Tenn. 2006), aff'd in part, vacated in part, 275 Fed. Appx. 495, 505-09 (6th Cir. 2008)(attaching little significance to file reviews in the context of psychiatric evaluations because the specialty is dependent upon interviewing and spending time with patients); *Javery v. Lucent Technologies, Inc.,* 741 F.3d 686, 702 (6th Cir. 2014).

The Court finds that RM has complied with the Policy's language as to the

13

evidence required to support her disability claim. Defendant's file reviewers' opinions are of little weight since they did not interview or spend time with RM to understand her symptoms. The file reviewers have little bases to reject the three affidavits submitted by RM's treating physicians that RM is totally disabled and unable to function at "any" work setting of her own occupation since they did not examine or spend time with RM. RM submitted sufficient evidence under the Policy that she is disabled from various forms of mental illness.

### 4. Application to Occupational Standard

Applying the medical evidence noted above to the occupational standard of an Interventional Radiology Technologist, the Court finds that RM is precluded from performing her occupation. As an Interventional Radiology Technologist, RM is to perform special procedures examination and CT-guided/assisted procedures, administer intravenous media and/or medications and perform work of a Registered Diagnostic Radiological Technologist. (AR 554-561; AR 36, 1326-1432) Given RM's inability to concentrate and her anxiety, Defendant has not shown that RM is able to perform the occupational standard of RM's occupation. Defendant argues that RM is not disabled because she complains that the "cause" of her issues is her workplace. However, Defendant has not shown that given RM's disability, she can perform her own occupation in another setting. Defendant has not rebutted RM's

three treating medical personnel's affidavit that expressly notes that RM is unable to perform in any work setting. Even though RM may have felt better on occasion away from her current work setting, none of the medical evidence indicate RM could work in another work setting. RM has shown by a preponderance of the evidence that she is unable to perform her occupation in any work setting. Defendant has failed to rebut this showing.

### 5. Amount

Based on Defendant's calculation, RM's monthly benefit is $2,895.53 per month. (AR 35) The 180-day elimination period has been met and Defendant should begin payment as of November 10, 2011. (AR 39) RM submitted the required Proof of Claim to support her disability under the Policy. RM has sufficiently submitted evidence that she is totally disabled from her own occupation. RM is entitled to full benefits under the Policy.

## III. CONCLUSION

For the reasons set forth above,

IT IS ORDERED that Defendant's Motion for Judgment (Corrected) **(Doc. No. 19)** is DENIED.

IT IS FURTHER ORDERED that Plaintiff's Motion for Judgment on the Administrative Record **(Doc. No. 20)** is GRANTED.

15

IT IS FURTHER ORDERED that the Plan Administrator's decision is REVERSED and judgment in favor of Plaintiff is entered.

IT IS FURTHER ORDERED that this action is designated CLOSED on the Court's docket.

S/Denise Page Hood
Denise Page Hood
United States District Judge

Dated: September 30, 2014

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 30, 2014, by electronic and/or ordinary mail.

S/LaShawn R. Saulsberry
Case Manager